The Wean Engineering Company, Inc. v. Commissioner.
Wean Engg. Co. v. Commissioner
Docket Nos. 107584, 109876.
United States Tax Court
1943 Tax Ct. Memo LEXIS 185; 2 T.C.M. (CCH) 510; T.C.M. (RIA) 43348; July 24, 1943
*185 David R. Shelton, Esq., Munsey Bldg., Washington, D.C. H. H. Hoppe, Esq., Second Nat'l Bldg., Warren, O. and Curtis R. Henderson, Esq., for the petitioner. Thomas F. Callahan, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This is a consolidated proceeding involving income tax deficiencies for the years 1937, 1938 and 1940 and section 102 surtax deficiencies for the years 1936 to 1940, inclusive. Only the surtax deficiencies in the respective amounts of $68,519.70, $66,793.04, $54,173.43, $25,388.47 and $46,406.62 are contested. Returns for all years were filed with the collector of internal revenue for the eighteenth collection district of Ohio at Cleveland. The case was submitted on oral testimony, exhibits and a stipulation of facts including additional exhibits. The facts as stipulated shall be considered a part of our findings, but we include herein only so much thereof, together with further facts established, as are necessary to a discussion of the issue. Findings of Fact Petitioner is an Ohio corporation organized in 1929 with a paid-in capital of $10,000 represented by 250 shares of no par stock, 247 of which were issued to R. J. Wean. *186 Subsequently, R. J. Wean gave 10 shares of his stock to his wife and 10 shares to his son, this constituting the only change in stock ownership since petitioner's inception. No additional capital was paid in, though the capital account was increased to $750,000 by transfers from earned surplus, the last of which being a $250,000 transfer in 1936. Petitioner's directors have at all times been R. J. Wean, his wife, Sarah R. Wean, and E. J. Boyd, a banker. Directors' meetings were held regularly with all directors present and actively participating therein. Petitioner's president and managing director is R. J. Wean who, as such, is in charge of engineering, sales, purchases, allocations of contracts and finances. He is the sole full-time officer and the only one receiving a substantial salary. R. J. Wean had concentrated on the designing, manufacture and sales of sheet and tin plate machinery during all of his business life and, prior to the organization of petitioner, had been associated with several concerns in that type of business. His withdrawal as officer and stockholder of such a company immediately prior to petitioner's organization was induced by his disapproval of the managements' *187 stripping the company of capital in the face of expanding business. Petitioner was formed for the purpose of specializing in sheet steel and tin plate machinery. Later, due to changes in manufacturing methods, it also specialized in designing and manufacturing strip mill processing equipment. Upon its inception petitioner acquired licenses on certain patented machinery, among them being the Flinn & Dreffein furnace. During its early years petitioner engaged principally in the sale and installation of such machinery, it being customary for it to arrange for the collection of the purchase price in advance of the time it had to pay the fabricator from whom it secured the equipment. Meanwhile, through the acquisition of further licenses and the efforts of its own engineers and designers with the occasional collaboration of others, petitioner developed improved machinery for use by sheet steel and tin plate mills. Thus were created a series of machines which together comprised petitioner's patented "combination system." The combination system enabled sheet steel mills to do mechanically what formerly had been done by hand. From 1931 through 1937 a large part of petitioner's business involved *188 the sale and installation of this type machinery in the smaller non-integrated mills. The sale and the installation of the aforementioned licensed equipment made by others together with the engineering and construction of the combination system may be termed the "first phase" in petitioner's corporate existence. The "second phase", overlapping the first particularly during 1936 and 1937, had its beginning around 1934. It involved the design, manufacture, sale and installation of "Wean engineered" equipment in strip steel mills. These new type mills, operated by the large steel corporations, manufactured tin plate and paper thin steel in a continuous ribbon rather than in sheets as was done by the non-integrated companies. The strip method brought about the production of a superior product at a lower cost. The selling price of strip mill machinery far exceeds that of comparative installations for sheet mills. For example, a flying shear line costs about $140,000 as against $6,000 to $12,000 for a sheet shear and a pickling line costs from $300,000 to $500,000 as compared to $1,000 to $10,000 for a soaking vat. The manufacturing costs are in proportion. In dealing with its "Wean" *189 equipment, petitioner acts as a consulting engineer in determining the equipment needed by its customer, engineers and designs the equipment required, purchases the raw materials entering into the product, has the material machined and fabricated, purchases the electrical attachments, installs the equipment in customer's plant, puts it into test operation and services it for a year. The only charge to the customer is the purchase price. Over three-fourths of petitioner's total sales during the taxable years in question consisted of "Wean engineered" equipment including the combination system. Some units sold for over $300,000 each. On many of the larger orders petitioner received progress payments of 50 percent of monthly estimates of labor and materials with the balance payable under varying terms, but generally petitioner financed all costs of manufacturing its "Wean" equipment in advance of securing its selling price. Such costs during the years in question varied from a low of $1,308,000 in 1936 to a high of $2,354,000 in 1938. In addition petitioner expended from $4,000 to $5,000 per month on labor and materials in servicing such equipment. Often final payments due petitioner *190 were not made until several weeks or several months after the terms called for in the orders. In 33 of the 60 months from January 1, 1936 to December 31, 1940, petitioner's current expenses exceeded its current receipts. Petitioner required a reserve of $250,000 in each of the taxable years to cover delays in receipts. Petitioner is peculiarly fitted to engineer and install a modified strip mill which would cost about $4,000,000, but the steel companies have felt petitioner to be too small financially to carry through such a program. In 1941 petitioner bid on two and a half million dollars worth of orders for a single purchaser. Only one million dollars worth of business was placed with it on the ground that the amount must be so limited due to petitioner's size and financial condition. Petitioner has 53 patents, 34 applications for patents and 40 licenses to operate 79 additional patents and applications. In its typical sales contract petitioner agrees to save harmless the customer, without limitation as to time or liability, from all costs, expenses or damages arising out of infringement or claim of infringement of patents in the use of the articles sold. In the event an injunction *191 is had against the customer, petitioner agrees to either procure for it a license to operate the specified equipment; modify the equipment to make it non-infringing, subject to the approval of customer's engineer; or take back the equipment and refund the purchase price. Because of the lack of limitations on such agreements, no indemnity bond can be written covering contingent patent obligations by major American insurance companies. In instances where such agreements are limited to five years and in an amount equal to the selling price of the machine ordered, such bonding companies require a full deposit of cash or Government securities as collateral and charge a premium of from one-half of one percent to one and one-half percent of the maximum liability. Petitioner should have at all times a reserve in actual funds to meet contingent liabilities arising out of patent guaranties in a sum equal to about two percent of its accumulated sales for the preceding five years. This would require a reserve of $286,000 at the end of 1936, $411,000 at the end of 1937, $463,000 at the end of 1938, $448,000 at the end of 1939, and $453,000 at the end of 1940. Petitioner has actually paid out $29,550 *192 in fulfillment of its patent guaranties. Pending is an action commenced in 1938 involving $900,000, the claim first having been made in 1931. Undisposed of is a claim first made in 1938 and renewed in 1940 involving approximately $1,000,000 on which no suit has been commenced. Petitioner in 1939 also paid a $14,000 judgment and fees of $10,109.53 in a 1936 suit for royalties under an employment contract. From its inception through the taxable year 1940 petitioner had no plant of its own. Its "Wean" machinery was fabricated in four or five companies which also manufactured products of their own. These companies did petitioner's work only when such did not interfere with their own production. In 1936, 1937, 1940 and 1941 this situation caused petitioner to fall back on its deliveries. Petitioner in 1936 and 1937 made several attempts to secure a suitable building for manufacturing purposes. In 1938 it started negotiations for the purchase of the Broden Construction Company and an 80 percent interest was bought in 1941. To enable it to better procure the fabrication of its equipment, petitioner in 1937 loaned McKay Machine Company $50,000 to partially finance plant expansion and loaned *193 Hallden Machine Company $25,000. It also made small advances to McKay and other companies whose products it sold to aid their financing. During the taxable years, petitioner continued to develop new equipment and processes and made experimental installations in various steel plants, it having no laboratory of its own. Petitioner, in each of the taxable years in question, required a reserve of from $300,000 to $500,000 for plant and laboratory construction. Petitioner's total sales for each of the years 1935 through 1940, working capital at the end of each year, net worth at the end of each year, and its net profit for each of such years is as follows: Total
Working
Net
Net
Sales
Capital
Worth
Profit
1935
$2,987,302
$515,300
$ 547,590
$248,161
1936
3,752,556
711,945
953,094
470,529
1937
5,160,454
652,396
1,148,937
368,984
1938
3,682,797
858,686
1,348,507
286,440
1939
2,698,559
847,083
1,446,126
194,687
1940
3,319,854
834,274
1,351,416
225,744
In 1938 petitioner turned over its net worth 2.7 times as compared to an average turnover of .9 times for the machinery industry as a whole. It turned over its net "working capital" 4.4 times as *194 compared to 1.7 times for the industry as a whole and 1.6 and 1.5 times, respectively, for its two principal competitors. "Working capital" did not include investments held by petitioner. These increased from $138,358.65 at the end of 1935 to $747,805.61 at the end of 1940. A major part of such investments were made in companies which were petitioner's customers, which it hoped to make customers or which used the products manufactured by its customers. Most investments were in listed securities. Earnings from such investments comprised a small fraction of petitioner's total earnings. Profits among American machinery manufacturers bear a relation to size. The larger companies are more apt to have profits and the percentage of their earnings on their investments are generally greater. Comparatively speaking, petitioner is a medium sized corporation. Its five principal competitors are much larger, having net worths in 1940 ranging from approximately $7,000,000 to $14,000,000. It is the practice among strip mill operators to require financial statements of their machinery suppliers and a satisfactory showing of their financial ability to execute their orders. The following is a composite *195 balance sheet for all of the years of petitioner's existence: ASSETS
1929
1930
1931
1932
1933
Cash
$ 18,517.28
$ 18,242.89
$118,644.37
$147,325.40
$168,924.09
U.S. Bonds
19,918.62
81,317.25
45,751.23
48,616.05
13,312.50
Industrial Bonds &
Stocks
9,250.00
3,500.00
67,287.71
Notes Receivable
Acc'ts Receivable *
125,222.12
72,134.74
135,860.37
111,452.19
157,647.84
Inventory
326.15
5,238.03
6,407.25
6,219.16
Expense Advances
550.00
50.00
50.00
50.00
150.00
Equipment *
260.33
228.78
197.23
Furniture & Fix-
tures *
799.47
964.03
1,175.46
1,077.14
1,556.04
Automobiles *
605.53
579.38
2,546.50
1,857.81
2,850.02
Patents *
1,706.02
4,111.24
5,765.75
Total Assets
$165,113.02
$173,614.44
$320,472.31
$324,625.86
$423,910.34
LIABILITIES
Accounts Payable
$143,595.19
$ 93,772.39
$148,883.68
$117,045.36
$141,988.30
Taxes
1,211.96
8,419.85
14,215.10
7,432.51
14,092.80
Reserve for Contin-
gencies
881.83
3,000.00
5,114.78
Proprietary Interest
Capital stock
10,000.00
10,000.00
10,000.00
10,000.00
150,000.00
Earned Surplus
10,305.87
61,422.20
146,491.70
187,147.99
112,714.51
Total Liabilities and
Capital
$165,113.02
$174,614.44
$320,472.31
$324,625.86
$423,910.39
*196 ASSETS
1934
1935
1936
1937
Cash
$260,844.78
$ 283,629.56
$ 741,015.78
$ 837,872.29
U. S. Bonds
13,504.75
13,343.75
82,843.75
82,343.75
Industrial Bonds &
82,877.07
125,014.90
214,313.69
360,481.09
Notes Receivable
5,000.00
8,900.70
5,100.70
45,100.70
Acc'ts Receivable *
77,481.48
782,328.61
435,633.23
383,783.32
Inventory
22,327.09
56,664.44
65,429.40
126,520.17
Expense Advances
300.00
300.00
410.00
485.00
Equipment *
165.68
134.13
Furniture & Fix-
tures *
1,999.26
2,987.68
4,559.75
6,292.99
Automobiles *
2,398.30
3,499.20
3,317.67
2,738.06
Patents *
8,253.92
10,127.83
10,079.32
10,603.01
Total Assets
$475,152.33
$1,286,930.80
$1,562,703.29
$1,856,557.88
LIABILITIES
Accounts Payable
$139,539.26
$ 532,812.83
$ 449,674.65
$ 542,576.91
Taxes
9,299.80
78,159.88
148,290.19
154,441.39
Reserve for Contin-
gencies
1,945.20
118,240.01
1,565.95
Proprietary Interest
250,000.00
500,000.00
750,000.00
750,000.00
Earned Surplus
74,368.07
57,718.08
213,172.50
409,539.58
Total Liabilities and
Capital
$475,152.33
$1,286,930.80
$1,562,703.29
$1,856,557.88
ASSETS
1938
1939
1940
1941
Cash
$ 831,654.80
$ 681,191.42
$ 683,529.10
$ 766,669.12
U. S. Bonds
93,343.75
148,843.75
178,943.75
221,178.92
Industrial Bonds and Stocks
407,798.28
475,331.43
568,861.86
661,039.67
Notes Receivable
38,569.45
25,764.20
21,786.95
121,467.34
Accounts Receivable *
464,479.41
494,276.79
682,693.83
403,073.69
Inventory
41,150.29
50,936.64
52,512.58
80,238.16
Expense Advances
485.00
585.00
600.00
538.55
Real Estate
13,190.69
Furniture & Fixtures *
5,896.38
6,031.40
6,680.88
6,574.39
Automobiles *
5,162.06
4,509.25
5,268.41
5,256.14
Patents *
10,634.71
12,491.30
14,253.80
15,123.20
Total Assets
$1,899,174.13
$1,899,961.18
$2,215,131.16
$2,294,349.87
LIABILITIES
Accounts Payable
$ 472,648.89
$ 395,531.14
$ 551,892.84
$ 738,408.31
Taxes
67,383.53
45,813.12
75,482.61
** 38,824.61
Accrued Compensation
Proprietary Interest
Capital Stock
750,000.00
750,000.00
750,000.00
750,000.00
Earned Surplus
609,141.71
708,616.92
*** 837,755.71
*** 767,116.95
Total Liabilities and Capital
$1,899,174.13
$1,899,961.18
$2,215,131.16
$2,294,349.87
*197 In 1936 petitioner paid a dividend of $60,000 and it paid a dividend of $100,000 in each of the succeeding four years. In declaring dividends in 1936 consideration was given to unfilled orders of $3,074,500, quotations outstanding in the sum of $20,606,000, manufacturing and laboratory facilities needed, the changing and expanding character of the business and the claims against petitioner, both real and potential. The same factors and some others were considered when dividends were declared in the following years. Contracts outstanding in 1937 amounted to $2,505,000 while petitioner had quoted on $19,247,000 worth of orders. It had recently shipped $5,000,000 in equipment on which final payments were apt to be slow and on which petitioner might have to *198 make changes at an additional expense to it. Petitioner had also made loans to two fabricators during the year. In 1938 petitioner built up its engineering and office staff and was defending a suit involving the alleged interference of its combination system pattern. Additional factors considered in 1939 were the outbreak of the war in Europe with the attendant loss of export business, U.S. Steel Company's request to stand ready to aid in a $20,000,000 expansion program, and negotiations toward the recapitalization and reorganization of a competitor. In 1940 petitioner was entering the field of war equipment and this factor entered into its dividend policy. At no time did petitioner's directors or R. J. Wean consider the tax effect of petitioner's dividend policy. Tax returns for R. J. Wean and petitioner were prepared from bookkeeping data by an accountant not connected with petitioner's organization. R. J. Wean's income was in the surtax brackets in each of the taxable years 1936 through 1940. Petitioner is not a holding or investment company. None of petitioner's stockholders has at any time borrowed money from or made sales to petitioner. Opinion The sole issue in this proceeding *199 is whether petitioner was formed or availed of during any or all of the taxable years 1936 through 1940 to prevent the imposition of surtax on its shareholders within the meaning of section 102(a), Revenue Acts of 1936 and 1938 and the Internal Revenue Code. The question is one of fact which can be determined only upon the material evidence presented in the instant case attended by the statutory presumptions, if such are applicable. Section 102(b) of the Revenue Act of 1936 makes the fact that the earnings and profits are allowed to accumulate beyond the reasonable needs of the business prima facie evidence of a purpose to avoid surtax on the shareholders while section 102(c) of the Revenue Act of 1938 and the Internal Revenue Code makes such fact determinative of such purpose, subject, however, to rebuttal by a clear preponderance of the evidence. In his brief respondent does not urge that petitioner was formed for the purpose of preventing the imposition of surtaxes upon its stockholders, nor is this a case wherein such contention would be impressive. Petitioner was organized through the offices of R. J. Wean to deal with sheet steel and tin plate machinery, R. J. Wean long *200 having been interested in such equipment. Operations were commenced with a paid-in capital of only $10,000; no securities were transferred to petitioner; other than the purchase of Government bonds, no substantial investments were made by it until several years after its inception; and petitioner did engage, in fact, exclusively in the business for which it was created. These circumstances are incompatible with a purpose in its formation to avoid surtaxes upon shareholders and we hold that petitioner was not so formed. We next consider whether the accumulation of earnings and profits in the taxable years was beyond the reasonable needs of the business. The answer to this question requires the consideration of numerous factors among them being the character of the business, its course relative to expansion, customers' demands, contract obligations, hazards encountered, effect of world conflict, type and amount of competition, use of surplus, fluctuation of sales, experience in receipts and need for additional inventory and fixed assets. Petitioner has at all times been engaged in the specialized filed of furnishing machinery to the manufacturers of sheet and strip steel and tin plate. *201 The number of potential customers is necessarily limited to the number of such manufacturers and the volume of sales closely follows expansion and replacement programs of the steel makers. Accordingly, future demands are not predictable on any sound basis and petitioner's need for liquid assets to meet sudden surges in orders and to whether equally sudden curtailments obviously is greater than the need for such assets on the part of similarly sized companies dealing in stable consumer's goods. While petitioner has been markedly successful from its inception, it is noteworthy that the conspicuous jump in its assets and earnings was coincident with the advent of the strip steel mills. Prior to this time petitioner had catered to the small non-integrated companies whose custom is to purchase steel bars and ingots from the large corporations and from them turn out sheet steel and tin plate. Much of the machinery sold to this class of customer was not of petitioner's own design but was purchased for resale, petitioner obtaining its selling price before being obliged to pay the manufacturer. Even petitioner's own products, of which it sold progressively more as time went on, bore a relatively *202 small cost per unit as compared to the much higher costs for the strip steel equipment sold in the years with which we are here concerned. During the early period in petitioner's corporate existence, which is termed the "first phase", the demand for working capital was not great. A considerable share of the sales required no financial outlay and in those requiring such outlay the amount tied up in each order was comparatively small. All this was changed by the new strip method of manufacture. In the first place the processing machinery required by the strip mills was larger and costlier and, as builder thereof, petitioner had to tie up much more money in each unit, petitioner financing its entire orders except in instances where progress payments were made. Secondly, a complete strip mill embraced machinery costing many millions of dollars all of which could be rendered useless by one unit which failed of completion or operation. Consequently, petitioner, which designed, manufactured, installed and guaranteed performance of its strip mill machines, could sell to the large steel corporations operating these mills only upon their satisfaction with petitioner's financial ability to perform. *203 It is clear that in this the "second phase" of petitioner's existence, the need for capital had greatly increased by reason of the type of machinery built and the customer's special interest in financial worth. That petitioner was virtually forced to enter the strip mill equipment field to successfully continue is borne out by the evidence and reasonable inferences to be drawn therefrom. The steel plate manufactured by this method was better and could be sold to the ultimate consumer at a lower price. It seemed apparent that this system would largely supersede the old manufacturing methods and result in a loss of market unless petitioner adapted itself to the changing conditions. Regardless of the inducements, however, petitioner had the undoubted right to enter the new field and to accumulate surplus to adequately finance its endeavor without necessarily subjecting itself to section 102 surtaxes. As we said in , "the cited sections do not contemplate that a business should remain static; it must be assumed that any business shall have the right to grow. Necessarily incident to the exercise of this *204 right are the making and pursuit of plans both as to organization and as to finances which will permit the accomplishment of the contemplated development." Petitioner's principal competitors were much larger concerns. That petitioner should attempt to lessen the gap between it and its competitors is only natural, in view of the advantages emanating from size and economic stability in this particular field. To be sure, petitioner might have effectuated this desire by increasing its capitalization and procuring additional funds from outside sources. But there is nothing reprehensible in achieving the same result by ploughing back earnings. Moreover, the election to adopt the latter practice does not demand that section 102 be applied if the purpose is not to avoid surtax on stockholders. Under the terms of its sales orders petitioner agreed to protect its customers from liability for patent infringement arising from the use of machinery purchased of it. In addition thereto, petitioner covenanted that it would, in the event of injunction, secure for its customers a license to operate the infringing equipment, redesign it subject to its customer's approval or, if it could do neither, *205 repurchase the machinery. These agreements were unlimited in time and maximum liability. We think petitioner required reserves (whether earmarked as a specific reserve account or not) to meet such contingencies. Petitioner engaged in designing and engineering complicated pieces of machinery containing a multitude of parts. By the very nature of things the possibility of infringement or interference with prior patents was ever present. Since petitioner assumed the risk, in the exercise of business decency and fair dealing it was required to place itself in a position to meet liability in accordance with its contract terms. That such liability is real is evidenced by the fact that petitioner at the time of the hearing of the instant proceeding, was the defendant in a patent suit involving $900,000 in possible damages and had received a claim which, if prosecuted to maximum success, would involve $1,000,000 more. Qualified witnesses testified that petitioner should have a reserve for patent liabilities based upon a percentage of its total sales. By the end of 1936 petitioner had sold since its organization in excess of $14,000,000 worth of equipment and this had been increased to about *206 $23,000,000 by the end of 1940. In our findings of fact we have set forth what we find to be a reasonable reserve for contingent patent liabilities. This figure varies from $286,000 at the end of 1936 to about $45,000 in subsequent years. In the taxable years in question petitioner did not own its own plant or experimental laboratory. The machines which it designed and engineered were fabricated in shops owned by others from materials purchased by petitioner, the fabrication cost usually being figured on an hourly time basis. This method of manufacture was not entirely satisfactory to petitioner in as much as facilities were not in all cases readily available. Petitioner was embarrassed particularly in 1936, 1937, 1940 and 1941. The evidence suggests that it was not petitioner's intention to indefinitely continue this practice. Negotiations were opened on several occasions in 1936 and 1937 toward the purchase of a plant. An 80 percent interest in the Broden Construction Company was acquired in 1941. While petitioner might have borrowed to finance the purchase price when a suitable place was found, it certainly was not improper for petitioner to choose to accumulate earnings for production *207 facilities. . Moreover, we are convinced that the plant acquisition idea was not simply an afterthought used to justify, in part, petitioner's accumulation of earnings. Accordingly a reserve for building purposes was proper and such an account in the sum of $300,000 to $500,000 was reasonable. From the beginning of 1936 to the end of 1940, petitioner's net worth increased from $557,718.08 to $1,587,755.71. Almost one-half of this advance took place in the year 1936. Total assets increased in practically the same amount as net worth, liabilities remaining relatively constant, the increase being represented largely by cash in 1936 and investments during the following four years. The years 1936 and 1937 were unusual in that they marked the real beginning of substantial sales of "Wean" equipment to the strip mills while the nonintegrated steel mills, which had up to that time failed to convert to mechanical equipment such as petitioner's combination system, were forced to do so to try to meet the strip mill competition. Thus, petitioner's two "phases" here overlapped resulting in exceptional business years. Continued *208 volume sales to the sheet mills was not to be expected and did not occur. Petitioner's increase in financial strength was made in spite of dividends of $60,000 in 1936 and $100,000 in each of the other years in question. Admittedly, a larger part of petitioner's earnings were accumulated. However, in view of the greatly increased need for capital evidenced by the advent of petitioner's "second phase" of business, its contingent liabilities, proposed plant program, the character of the products manufactured, fluctuation in market as well as considerations such as delay in final payments and the effect of world conditions in the export market, we are unable to say that in any of the taxable years in question petitioner's accumulation of earnings and profits was beyond the reasonable needs of the business. The cash on hand in no year exceeded an amount reasonably necessary to carry forward orders on hand plus a fair proportion of business on which bids had been made, while the investment account failed to approach an amount equal to necessary reserves for contingencies and plan purchase until 1940. Since petitioner's accumulations were reasonable, as stated above, we do not indulge *209 in the statutory presumptions of purpose to avoid surtax upon stockholders. Regardless of our finding with respect to the reasonable necessity of the existing accumulations, however, petitioner has demonstrated by a preponderance of evidence a lack of purpose to avoid surtax. There is no question but what larger dividends would have resulted in the assessment of surtax upon R. J. Wean, petitioner's principal stockholder. But the application of section 102(a) is conditioned upon purpose, not effect. . The record is signally devoid of any evidence suggesting that the question of taxes was ever considered by petitioner's directors or by R. J. Wean individually, in determining dividend policy. Quite the contrary, the uncontroverted testimony indicates that no regard was given the matter of taxes by R. J. Wean who was charged with petitioner's financial affairs. An accountant was employed to prepare the necessary tax returns for both petitioner and R. J. Wean as an individual. Such returns were made entirely with reference to past transactions and indeed, no inquiry was made by Mr. Wean regarding tax complications as the *210 effect of dividends upon his tax liability and no such information was volunteered by the accountant. No figures were compiled to indicate comparative tax liabilities of petitioner and R. J. Wean as computed with and without complete distribution of petitioner's earnings until shortly before the trial of this cause. Furthermore, the record discloses a plan for petitioner which is entirely consistent with its accumulation of earnings. Petitioner, through the efforts of R. J. Wean and its engineering staff, was responsible for numerous improvements in steel processing methods. It was its management's hope to make petitioner a real factor in the industry and to place it in a satisfactory competitive position with other manufacturers of similar lines. Petitioner also wished to attain a financial position which would allow it to manufacture all equipment which its engineers were capable of designing. There is nothing obnoxious about these objectives. At the beginning of 1936 petitioner's size and surplus were far below that necessary for realization of its plan. Profits continued to be accumulated but at the end of 1940 petitioner remained smaller than its chief competitor and even in *211 1941 petitioner was refused a portion of a large bid because of its financial limitations. Here is not a situation where the taxpayer has a monopoly and continues to accumulate earnings without a justifiable purpose. Cf. . No question of monopoly is suggested and dividend policy for each year in question was adopted after consideration of several legitimate business factors and purposes. Among them were unfilled orders, outstanding quotations, manufacturing facilities needed, expanding business, and contingent liabilities. Nor is this a case where loans were made to stockholders. Cf. ; . Under other circumstances a substantial increase in corporate investments has mitigated against an avowed business purpose in accumulating earnings. Here, however, there is a practical relationship between petitioner's manufacturing business and its security holdings. Investments were made among petitioner's customers and with those whom it hoped to sell. Similar purchases *212 have been held to be in keeping with sound business management. . Moreover, petitioner's investment account was, for the most part, liquid and simply constituted a means of holding what might better be termed as reserved for contingencies and building. After careful consideration of the entire record, we conclude that that petitioner was not availed of during any of the taxable years 1936 through 1940 for the purpose of preventing the imposition of the surtax upon its stockholders within the meaning of section 102(a) Revenue Acts of 1936 and 1938 and the Internal Revenue Code. Petitioner has not contested the normal tax deficiencies determined by respondent. These deficiencies will be included in the recomputation. Decision will be entered under Rule 50.
Footnotes
*. Net (less reserve). ↩
**. This represents Federal income tax for the fiscal year ended November 30, 1941, in the amount of $31,800.10, and an additional undisputed assessment for the calendar year ended December 31, 1940, in the amount of $422.39. ↩
***. Without reserve for the taxes which are here in controversy. Such taxes with interest amounted to $222,085.88 as of December 31, 1940, and $310,183.72 as of December 31, 1941.↩